IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 3, 2019

**IN RE NICHOLAS C. ET AL.**

**Appeal from the Juvenile Court for Cocke County**
**No. CU-05441      Brad Lewis Davidson, Judge**

_____

**No. E2019-00165-COA-R3-PT**

_____

The trial court terminated the parental rights of Mother and Father to their four children on the grounds of abandonment by failure to visit, substantial noncompliance with the permanency plan, and failure to manifest the ability and willingness to assume custody of the children. On appeal, we conclude that there is clear and convincing evidence to support all three grounds as well as the trial court's best interest determination. We, therefore, affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and CARMA D. MCGEE, JJ., joined.

Brett Arthur Cole, Seymour, Tennessee, for the appellant, Jason B.C.

Ryan Thomas Logue, Newport, Tennessee, for the appellant, Carol L.G.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Carol L.G. ("Mother") and Jason B.C. ("Father") (collectively, "Parents") are the parents of four children: Nicholas, born in 2005; Tiffany, born in 2008; Skylar, born in 2010; and Airies, born in 2012. The Department of Children's Services ("DCS" or "the Department") first became involved with the family in May 2015 after seven-year-old Tiffany drew a picture at school of male genitalia and made comments about the drawing suggesting sexual abuse. The Department's investigation revealed that the entire family

was living in a motel room with two queen-size beds. The children were removed from Parents' custody and, on December 3, 2015, Parents waived their rights to an adjudicatory hearing and the juvenile court found the children to be dependent and neglected. The trial court's order stated that Parents "may have supervised, therapeutic visitation at the discretion of the therapist."

A previous petition to terminate the parental rights of Mother and Father was denied by the trial court, but the children remained in DCS custody. The Department met on December 19, 2017, to develop a new permanency plan to address the issues that Mother and Father needed to resolve. Neither parent attended this meeting.[1] Mother's attorney attended the meeting, but Father's attorney did not. The goals of the permanency plan were the return of the children to their parents or adoption.[2] The plan was ratified by the trial court on February 15, 2018.

The Department filed the current petition to terminate Mother's and Father's parental rights to Nicholas, Tiffany, Skylar, and Airies on August 24, 2018. The petition asserts three grounds for termination applicable to both parents: abandonment by failure to visit pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2); and failure to manifest the ability to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

<u>The hearing</u>

The trial court held a hearing on January 8, 2019. The first witness to testify for the Department was Robert Rouleau, the children's case manager for the entire three and a half years they had been in DCS custody. He stated that, during the four-month period prior to the filing of the termination petition (April 24 through August 23, 2018), Parents did not visit the children or contact him for visitation. Neither parent had visited the children at any point during their time in DCS custody, which began in 2015. Mr. Rouleau stated that Parents' visitation was at the discretion of their children's therapists, and that no therapist had recommended that the children have contact with Mother or Father. The children had seen several therapists.

Mr. Rouleau testified that, between April 24 and August 23, 2018, neither Mother nor Father contacted him at all. He stated that he had received no voice mails from either of them, and that he may have received one text message. Mother and Father had not come to the DCS office to see Mr. Rouleau. Mr. Rouleau testified that his last contact with Parents was at the previous termination hearing in October 2017. Thereafter, on

---

[1] As will be discussed below, Parents argue that they did not receive adequate notice of the meeting.

[2] The permanency plan gave a goal target date of December 10, 2016, a date that had already passed.

December 14, 2017, he texted them about the permanency plan meeting scheduled for December 19, 2017. Mr. Rouleau then testified:

I got a text from [Father] on the 20th that said that from now on to go through their attorneys for any meetings and contact, because he was going to the Justice Department to sue the crooked DCS and the Court System in Newport. Something like that.

After that text, Mr. Rouleau stated, he avoided contacting Parents directly. He further testified:

Just to back that up, Ms. Lawson, who was the attorney for [Mother] back then, had contacted me probably a week or two after that and told me that the parents—that the mother told her she did not know about the [permanency plan] meeting. Which I then told her that I texted all three phone numbers that I had for her and that I was told not to contact them anymore except through their attorneys. And Ms. Lawson did tell me that she said that [Mother] did tell her that they did want me to go to the attorneys from now on. So at that point I did not contact the parents.

Asked about the steps Parents were to take to gain visitation, Mr. Rouleau stated that they were to engage with the children's therapists and perhaps eventually participate in family therapy if and when the therapist felt it was appropriate. Parents never informed him that they had contacted any of the therapists. Mr. Rouleau provided their attorneys with the therapists' contact information, but he did not know if the attorneys contacted Mother and Father to give them the information.

Mr. Rouleau stated that he provided Parents' attorneys with copies of the permanency plan. To the best of his knowledge, Parents had not completed the requirements of the permanency plan. Mother had not inquired about vocational rehabilitation, completed a parenting assessment, maintained contact with DCS twice a month, developed a plan to address the children's sexually reactive behaviors, paid child support, made arrangements for continuing therapy or inquired about the children's therapy needs, engaged in the children's therapeutic process, or provided proof of a driver's license or car insurance. Mother had signed releases. At the time of the permanency plan, Parents stated that they had housing, but Mr. Rouleau did not know if they had stable housing at the time of trial. He thought Mother had been "getting a check" and assumed that she continued to receive that money. As to Father, Mr. Rouleau testified that he had not maintained contact with DCS twice a month, developed a safety plan regarding the children's sexually reactive behavior, paid child support, made arrangements for continuing therapy, participated in medication management, participated in therapy to address his victim status, engaged in the children's therapeutic process, or provided proof of a driver's license or car insurance. Father was also

receiving a check, so he had some income. Parents had a vehicle at one point, but Mr. Rouleau did not know if they had it at the time of trial.

As to the third ground for termination, failure to manifest an ability to parent, Mr. Rouleau testified that he became concerned about Parents' housing situation when he saw a Go Fund Me page posted in November 2018 asking for help with rent. Parents were also seen on a street corner asking for help. Prior to the first termination hearing (in October 2017), Parents had given Mr. Rouleau gifts for the children, but they had not done so since that hearing. Mr. Rouleau was not aware of any cards Parents sent for the children.

At the time of the hearing, Nicholas was in a residential facility, and DCS was looking for a foster home. Tiffany had just been placed in a pre-adoptive home with Youth Villages. Airies was in a pre-adoptive Smoky Mountain Children's home, and Skylar had recently been moved to a pre-adoptive home through Smoky Mountain. Asked why the children were placed separately, Mr. Rouleau explained:

> In the beginning, they were all four together. Tiffany had some sexual reactive behavior with Airies. So at that point we separated Tiffany from the three boys.
> A little while after that probably—probably a couple of months, Skylar had some sexual reactive activity with Airies. So at that point, Airies was separated from Skylar and Nicholas.
> Nicholas and Skylar did stay together for a while until Nicholas was having some issues in the foster home and that's when he went to residential placement.

The Department had approved the adoption of the four children separately. It would not be safe for them to be in the same environment without a safety plan, including separate bedrooms and "probably alarms on the doors to hear if anybody is getting out in the middle of the night." Mr. Rouleau stated: "They would have to be watched almost round-the-clock when together."

Mr. Rouleau opined that it was in the children's best interest that Mother's and Father's parental rights be terminated and that the children have no further contact with Parents.

On cross-examination, Father's attorney questioned Mr. Rouleau about the text messages he sent on December 14, 2017, to the three telephone numbers he had for Parents to notify them of the permanency plan meeting on December 19, 2017. Mr. Rouleau acknowledged that he did not receive any response from Parents. When asked if he had inadvertently hung up on anyone, Mr. Rouleau recalled about two weeks prior to the hearing when he was on the phone with Nicholas's residential facility and the facility

- 4 -

requested a number for Parents. He remembered clicking onto one of Parents' names to open the contact and initiating a call by mistake, which he quickly ended. Maybe thirty minutes later, he received a call from the number he had inadvertently called, presumably because they saw a call from Mr. Rouleau. He did not answer because of the previous request to communicate through their attorneys.

Father's attorney stated that he did not have a record of receiving a copy of the permanency plan until the ratification hearing in February 2018. At that hearing, Father's and Mother's attorneys objected to the plan's goal of adoption.

When questioned by the guardian ad litem, Mr. Rouleau testified that the children's behavior and school performance had improved since they had been in DCS custody and had been treated with therapy and medication.

The next witness was Ashley Chitwood, a mental health therapist through Omni Community Mental Health. She testified that she was a licensed therapist in the State of Tennessee and had worked as a therapist at Omni for seven and a half years. Ms. Chitwood stated that she provided therapy for the three male children in this case, Skylar, Nicholas, and Airies. Their initial assessment was completed in July of 2015. Ms. Chitwood had worked with Skylar consistently since 2015 until his recent move to LaFollette, which was out of her service area. The last time she met with Skylar was in the fall of 2018. Ms. Chitwood began seeing Nicholas when he was admitted into the program in 2015 and continued seeing him into 2016; after that, he was successfully discharged. Once Nicholas returned in 2017, Ms. Chitwood was not his therapy provider. Shortly thereafter, Nicholas was admitted to a residential facility. With respect to Airies, Ms. Chitwood stated that the child was "not very verbal" when admitted in 2015 and did not cooperate with therapy, "mostly due to his age," she thought. She saw Airies in 2015 and 2016, but his file was closed in 2016 "because he wasn't cooperative." Airies also began receiving medication management services from another company because Omni did not treat children under the age of five for medication management. Ms. Chitwood further testified that she saw Airies and Skylar for family therapy in 2018.

Ms. Chitwood recalled writing a letter to the court in 2016 with her recommendations concerning visitation. She described the substance of her letter as follows:

> I stated that due to the amount of time that had lapsed since visiting with parents and continuing to work towards stability with the kids, I didn't think it would be appropriate for the children to have visits. But I did add a clause in here that if the Court deemed it appropriate that it be completed in a therapeutic setting.

Ms. Chitwood stated that she had no contact with either parent during the three years she was involved with the case. She had never received any messages from them. Ms. Chitwood further stated that she had not been provided with any contact information for Mother or Father, so she was unable to initiate contact with them.

As to Skylar, Ms. Chitwood testified that she never reached a point where she thought it would be appropriate for Parents to have visitation. Skylar did not remember his parents. When asked what she would have needed to see before she thought visitation was appropriate, Ms. Chitwood stated:

A. Throughout the course of treatment with Skylar, he struggled managing his emotions behaviorally, just complying with general rules and expectations, coping with transitions. He had a very difficult time anytime something was changed. I would have needed to see that Skylar was going to maintain stability, which he has now. But it's been—we've been working with him for three years. And he is in a better place now but—and then I would also hope that the parents were going to be consistent and do the visits, however they were scheduled, however that was going to occur.
Q. Okay. If the parents [had] tried to contact you early on and requested information about being involved in his therapy, how would you have responded to that?
A. I mean, I would have answered any questions they would have had and been cooperative. I was told that they may be calling me a couple of times last year. I was told that I should be hearing from them. And I was told when I first admitted them in 2015 that I may hear from them. But I didn't.

Ms. Chitwood was likewise asked to opine about Airies and whether it was appropriate for him to have visitation with Parents. She stated:

A. Airies still hasn't—he still has a great deal of work left to do as far as behavior and emotion regulation. He still has outbursts. He's still receiving therapy weekly. He just completed a more intensive program with us because of his behavior and just helping him regulate himself and not be so impulsive. He does not remember his parents at all. When I ask him about them, the people that he said was his parents, was his current foster mom and Derek, foster mom's fiancé.
Q. Okay. If the parents had been in contact with you and shown consistency, do you think it might have been possible at some point to have them involved in therapy?
A. It would have for him, yes. But because he was so young when he came into custody—it would have been better early on for him. Because he doesn't have a lot of memories of them now.
. . . .

Q. Okay. Did any of their attorneys that have represented them over the years get in contact with you?
A. Not that I'm aware of.

When cross-examined by the guardian ad litem, Ms. Chitwood testified that Skylar and Airies both had diagnoses of attention deficit hyperactivity disorder (ADHD) and were both taking medication. The boys' treatment plans focused on anger, defiance, and aggression in the home. When the boys first came into DCS custody, their therapists addressed problems with food hoarding. She stated: "Most of what has been worked on has been just following the rules, listening, not being impulsive, thinking about things before they do them." Ms. Chitwood further testified that all three boys exhibited outbursts of anger. Skylar and Nicholas "scratch[ed] themselves when they were angry if they were placed in timeout or something of that nature." The children also engaged in sexually reactive behaviors. Nicholas was diagnosed with autism.

Ms. Chitwood observed a change in Nicholas's behavior during the time she saw him. In the beginning, he was "very shy, extremely anxious" and "had a lot of nightmares." Medication for anxiety helped him stabilize, but he began to regress and act out behaviorally in 2017—cursing, yelling, refusing to obey his teachers, fighting with Skylar. He was subsequently placed in a residential facility. Skylar had improved over time; he was better able to regulate his emotions and control his impulses. He could function at school and comply with the rules, whereas in the past he would engage in risky behavior or blurt things out in the classroom.

Alexis Lewis, a former Omni therapist, testified that she worked with Tiffany for about seven months in 2017. Tiffany had just been released from residential care. She was "up and down in her behaviors." She and Ms. Lewis were working on developing her coping skills. Tiffany "started to connect more with her foster parents, care more about the rules and being more empathetic with others." Ms. Lewis communicated with Tiffany's foster parents, never with Mother or Father. She stated that, at the permanency plan meeting in December 2017, she provided her contact information to give to Parents so that she could meet with them to assess whether family therapy would be appropriate for Tiffany, but Parents never contacted her.

On cross-examination, Ms. Lewis stated that Tiffany was having a hard time coping in the home she was in at that time:

[S]he had been through many foster care situations and she just couldn't cope in general. I don't think it was specific to the home. Just specific to the nature of her symptoms. She couldn't self-soothe. She couldn't cope with her own mood. And not getting her way, she couldn't calm herself down, things like that.

. . . .

Oh, gosh.  She was defiant.  She was—she had—again, like I can't speak to all of the things, because it has been a year.  But she had behavioral issues at school. . . . She had boundary issues, physical boundary issues, not respecting people's personal space, too comfortable with people, a lot of things.  She had some sexually reactive behaviors.  Things like that.

The next witness, Melissa Smith, a resource coordinator at Omni, worked with Tiffany from May 2017 through October 2018.  Ms. Smith attended the permanency plan meeting on December 19, 2017, and she recalled that she and Mr. Rouleau were going to try to contact Parents but that "the parents had requested for all communication to go through their attorneys."  Ms. Smith attempted to contact Mother and Father at the three telephone numbers provided to her by Mr. Rouleau.  According to her testimony, "it was disconnected whenever I attempted to contact them."  Ms. Smith was told "that the parents would be given the therapists['] phone numbers as well as my phone number from their attorneys and that they could contact us."  Ms. Smith testified that she contacted all three of Parents' phone numbers between the December 19, 2017 meeting and the first of January 2018, but she never received a call back from them.  She was not able to leave a message at any of the numbers (because they were disconnected).

Ms. Smith stated that the only contact she had with Parents was at an IEP (individualized education plan) meeting at the first of the 2017 school year.  Mother called into the meeting, and Ms. Smith heard her voice over the phone.  Ms. Smith's contact with Tiffany ended in October 2018 when the child went to a new foster home.

The Department called Rebekah Crass, who was Tiffany's foster mother for a time as well as her mentor when she was in a residential facility. Tiffany came to Ms. Crass's home in June of 2016 for about a month and a half and then moved to intensive residential treatment for nine months.  Tiffany returned to the Crass home from April 2017 through August 2018, and she then went to another foster home.  Ms. Crass explained that, initially, Tiffany exhibited "a lot of issues with emotional dysregulation, physical aggression, some sexual hyperreactivity, defiance."  According to Ms. Crass, Tiffany showed classic signs of trauma and abuse, including bed-wetting and night terrors.  Ultimately, Tiffany's physical aggression led the team to decide that she needed a higher level of care.

When Tiffany returned to the Crass home after residential treatment, Ms. Crass testified, a lot of the same behaviors resurfaced, despite all of the work that had been done during residential treatment.  Although Tiffany improved in some areas, Ms. Crass found her physical aggression and emotional dysregulation especially challenging when Tiffany was in her home. During Tiffany's time in residential treatment, the Crass family had adopted a son, and Ms. Crass found it difficult to maintain the safety of both Tiffany and her son.  The Department and the Crass family tried therapy, brain mapping, and

other interventions, but the team ultimately decided to remove Tiffany from the Crass home in August 2018.

Asked if she ever spoke to Mother or Father about Tiffany's condition, Ms. Crass stated that there was a "no contact" order under which she was asked not to have contact with Tiffany's parents. She stated that Mother and Father never attempted to contact her and that Mr. Rouleau had never asked for an update regarding Tiffany to provide to Mother and Father.

Ms. Crass stated that she had had contact with Tiffany since her transfer to another foster home. Tiffany spent Christmas with the Crass family and displayed "some typical defiant behaviors." Ms. Crass testified that, in light of Tiffany's history of "extensive trauma and abuse," caution was necessary in placing her to prevent "unsafe incidents with another child." When Tiffany was living with Ms. Crass, there was an extensive safety plan in place. Ms. Crass described the plan as follows:

A. [Tiffany's] behavioral plan at school required someone to pick her up from the time we dropped her off and to carry—not to carry her—but to escort her to every class. She had to use a separate bathroom than other kids, escorted by a teacher. She would have to be escorted to the bus stop and she had a specific bus seat in which she would have to sit until she arrived at our home. And that was due to previous behaviors that she had at other schools.
Q. And in the home, could you can [sic] explain what that safety plan was?
A. Uh-huh. We were not allowed to have any other long-term placements with her. We were never called for other placements. Because she just—it is not an option to have any other foster children with her. The exception for our son was because he was in the process of being adopted by us. . . . And he also slept in our room.
   There were not to be any other children in her room, in the bathroom with her. She was not allowed to have sleepovers with other children or have any overnight contact with kids or adults. She couldn't stay in our bedroom either. She had to have a safe place to go whenever she was having her physical aggression incidents.

On cross-examination, Ms. Crass stated that Tiffany sometimes lied, like any other child. She did not think that it was possible that Tiffany lied to her in the disclosures she made about sexual abuse. Tiffany "never recanted any of those disclosures."

Ashley Stanley, the foster mother for Airies for the preceding three years, testified that, when he first came into her home, Airies was three years old. He was disruptive and exhibited "a lot of anxiety issues" and anger issues. According to Ms. Stanley, Airies "was just not listening, basically." During the three years that Airies had been in her

home, the child had been in therapy and was now on medication—Vyvanse for ADHD; Buspirone HCL for anxiety; Remeron for sleep; and L-Methfolate Forte for low folic acid to help him metabolize the medications. Ms. Stanley had stopped working outside the home in order to better care for Airies. She intended to adopt the child.

During the time that Airies was in her home, Ms. Stanley had not had any contact with Mother or Father. She understood that there was a "no contact" order in place. She stayed in contact with Airies's therapist about his progress. Upon questioning by the guardian ad litem, Ms. Stanley testified that Airies had calmed and become more focused since he started on medication. She described him as "a totally different child than from day one." In school, Airies was "doing a lot better now that we have the right medication for him."

Mother was the next witness called by the Department, and she admitted that she had not visited her children in three and a half years. She was not incarcerated or hospitalized during that time period. Mother stated that she attended court hearings and that she attended DCS meetings if she knew about them. She testified that, if she did not attend the meeting on December 19, 2017, she did not know about it. When asked if she knew about the meeting on December 19, 2017, Mother stated: "I don't know." Mother identified the phone number she was using on December 19, 2017, and stated that the number was one that Mr. Rouleau had for her and that she would have received a text message sent to that number. Mother also identified Father's number, but denied having a third number. According to Mother, both her number and Father's number were active as of December 19, 2017, and would not have been disconnected at that time:

> Q. Okay. But neither one of them were tore up in December of 2017?
> A. No. But it could be fixed. All you got to do is to switch batteries from my phone and recharge it, and still it pulls up on either phone.
> Q. Okay. Do you all ever share numbers? Would [Father] ever text someone from your phone?
> A. Yeah. If his phone wouldn't work. While his was charging, yeah.

Asked if she had contact with her attorney, Chris Lawson, in December 2017, Mother stated that she did not know Ms. Lawson's number and was waiting for her to call Mother. (Mother later obtained Ms. Lawson's telephone number.) Mother further testified that the only time Ms. Lawson called her was when Mother told her that she and Father did not want to talk directly to DCS. Mother affirmed that Ms. Lawson reviewed the permanency plan with her and stated that she called Ms. Lawson a few times to inquire about the children:

> Q. Okay. She went over a Permanency Plan with you. Was that over the phone?

A. Yeah. But at the end when I was about to hang up—I was planning—[Father] wanted to, you know, rather, you know, talk with the lawyers to talk to [Robert Rouleau].

Q. Okay. And that's what [Father] said to Ms. Lawson?

A. Yeah. He asked me if I'd ask her that.

Q. Okay.

A. And I did.

Q. Okay. Is that the last time that you ever had a conversation with Ms. Lawson?

A. Yeah. Cause she got a new job.

Q. Okay. Well, ma'am, that was in June of 2018. Did you communicate with her at all in the beginning of 2018?

A. I just called to ask her about if she heard anything about the kids and stuff like that. That's all I called about other than—

Q. Do you know how often you might have done that?

A. A few times.

Q. Was that a few times a month or just a few times during six months?

A. Well, I didn't want to like, annoy her, so I just called her a few rounds occasionally.

Q. Okay. Did you all ever discuss the Permanency Plan when you called her again?

A. Usually, she would go over it sort of, yeah, a little bit.

Q. Okay. Did you understand the requirements on the Permanency Plan?

A. Uh-huh.

Q. Did you ever ask her any questions for clarification about the Permanency Plan?

A. Uh-uh.

Q. Did you ever ask her for any help or to ask Mr. Rouleau for help on completing the Permanency Plan?

A. Uh-uh.

Q. Did Ms. Lawson ever provide you any phone numbers for therapists?

A. No. But I need some numbers. I ain't got no numbers.

. . . .

Q. You had a conversation with Chris Lawson about the Permanency Plan, but she gave you no numbers; yes or no?

A. No, she didn't.

Q. She didn't give you any numbers—

A. No.

Q. —in regards to the Permanency Plan?

A. No.

Q. Okay. Did you ask for any numbers to call the therapists?

A. No. Cause I didn't know to. I thought that they would just tell me.

- 11 -

Q. Now, ma'am, did you—you just testified a minute ago that you understood the steps on the Permanency Plan which included you contacting the therapists. Did you understand that step on the Permanency Plan?

A. In a way, I guess.

Q. Okay.

A. I guess—

Q. Did you ever ask for numbers so you could contact the therapist to comply with that part of the Permanency Plan?

A. No.

When asked if she ever attempted to contact any of the children's therapists, Mother stated that she did not have their phone numbers. She acknowledged that she never asked her attorneys for the therapists' phone numbers. Mother stated that she thought Mr. Rouleau would answer her telephone calls even though she and Father had informed him that they did not want him to contact them directly. Mother met her current attorney at a court hearing and gave him her phone number.

Mother testified that, at the time of the trial, she and Father were living in a room at the Family Inn. At the prior hearing (in October 2017), Mother and Father stated that they were living in a three-bedroom home. Mother stated that she and Father lived there for over a year and then decided to move out and put their belongings in storage "until they figure out something." She stated that the couple moved into a Quality Inn for two weeks, then a Relax Inn for a few days, then stayed with Father's mother for about a month, and had been at the Family Inn for about a week. According to Mother, about a year elapsed from the Parents' departure from the three-bedroom home to the present.

On cross-examination by her attorney, Mother testified that she loved her children and that, if they were returned to her, she would give them a home, food, and take them to their appointments.

When cross-examined by the guardian ad litem, Mother stated that, although she and Father were currently living in a motel, she could obtain stable housing. She testified that she attempted to contact Mr. Rouleau several times but acknowledged that she and Father had elected to have DCS go through their attorneys. If she needed to go somewhere, Mother would walk, call somebody for a ride, or call Anderson Transportation. She did not currently have a car because "it tore up," but planned to obtain one in August 2019. The last time she worked was "year before last at a motel for a little while." She received around $700 a month from social security and SSI benefits. According to Mother, she did not work because: "[T]hey cheated me out of $40, and it was only $120. I didn't like the pay. They're too cheap." She stated that, if she wanted to, she could work; she did not have any injuries or conditions that would prevent her

from doing so. Mother stated that $60 a month was taken out of her social security check for child support for all of the children.

Father was the final witness. He, too, testified that he had not visited the children in three and a half years and that he was not hospitalized or incarcerated during that time period. He stated that there was a "no contact" order preventing him from visiting the children. He was not aware of the meeting that occurred on December 19, 2017, or of receiving any text messages from Mr. Rouleau that week about a meeting. Father stated that he "may have" sent Mr. Rouleau a text message the day after the December 19 meeting, but he did not recall. When asked whether he ever requested, through his attorney, that DCS not contact him directly, Father stated: "I may have. I've got an anger issue and Mr. Rouleau sometimes upsets me." Father was sure that he did not text this request to Mr. Rouleau, but he may have made the request through his attorney.

Father stated that he never discussed the permanency plan with his attorney. He was aware of the previous permanency plan. After informing his attorney that he wanted all contact with DCS to go through the attorney, Father never contacted his attorney about the permanency plan or discussed it with Mother. He did not recall anything being said about therapist numbers during Mother's conversation with Ms. Lawson. According to Father, his phone was active in December 2017 and was never disconnected. He never received a text message from Mr. Rouleau concerning the December 19 meeting. Father stated that he always responded to Mr. Rouleau's text messages. He acknowledged that he sometimes contacted Mr. Rouleau from Mother's phone when his phone was charging or not working for some reason.

Father estimated that he contacted his attorney twice to discuss this termination case. He stated that he read the grounds alleged in the petition and "studied intensively with that and I understand the grounds." Father did not think that he and his attorney went over the permanency plan before the termination petition was filed in August 2018. He recalled that he and his attorney talked once or twice between February 15, 2018, and the August 2018 filing of the petition, but he did not think they discussed the permanency plan during those calls. He was not aware at that time that there was a new permanency plan. Father testified that he asked Mr. Rouleau to update him; he called about thirty times and texted about twenty-five times. Father called once from his mother's phone, but Mr. Rouleau hung up once he realized that it was Father.

Father was asked to read the following text sent to Mr. Rouleau:

From now on contact our lawyers to set up any meetings. I am going through the Justice Department to defeat this Crooked Court System, the DCS, and Newport.

- 13 -

Father did not have any recollection of this text message, but the immediately preceding text stated that the message was from Father, though it was dated four months earlier.

Father stated that Mother got the dates wrong about how long they lived in each location. They moved out of the three-bedroom home about six months (not a year) before the hearing. Mother and Father then lived at the Quality Inn for about three months, at the Relax Inn for a few days, at his mother's house for about two months, and had now been living at the Family Inn for about a week.

Father stated that he had been aware that the three older children had ADHD about three years earlier. He did not know about the autism diagnosis. He stated that he had been involved with the children's education plans to some extent. The last time he recalled calling his attorney to ask about the children was November 2017. Since then, he went to DCS and talked to Dwane Powers.[3] He tried to contact Mr. Rouleau but was told that Mr. Rouleau did not want to speak with him. Father stated that he left a message on Mr. Rouleau's answering machine and that he left two or three on Mr. Powers's answering machine. He contacted his attorney twice to ask about the children, and the attorney told him they were doing fine.

When cross-examined by his attorney, Father admitted that he could be confused about the timing of the phone conversations and that they may have occurred outside of the October 2017 to June 2018 time frame. Father testified that, according to information given to him by the child support office, he did not have to pay child support because he received SSI benefits.

With regard to family therapy, Father testified that he did not have contact information for the therapists. He said that he would have visited his children if given the opportunity and that he would have contacted the therapists if he had their phone numbers. Father testified that he was not aware of the meeting at which the new permanency plan was developed. He further stated that he was not aware of the court date in February 2018 when the permanency plan was ratified by the court and that, had he known about the court date, he would have been there. According to Father, if he had known about the conditions of the new permanency plan, he would have done what he could to satisfy them.

Father denied ever sexually abusing any of the children. He stated that he would never bathe them because he had been raped for many years. Mother bathed the children. Father testified that he had herpes.

On cross-examination by the guardian ad litem, Father stated that he received $771 a month in disability benefits and that he also worked "on the side." He did jobs

---

[3] Dwane Powers is listed on the December 19, 2017 permanency plan as "Additional Team Leader."

- 14 -

such as chopping wood, washing cars, or cleaning gutters when the work was available. Father stated that he did not have a car. To get to where he needed to go, Father testified, he walked or used public transportation. If the children were returned to him that day, Father stated that he would probably call one of this friends, who was a millionaire, and "he would let us rent the house or stay in the house that he owns." To get the children to school, he would rely on the school bus, public transportation, or buy a car. Father continued: "I would get the money. If that's what you're meaning." Father testified that he had no proof that he had worked the permanency plan because he did not know about the plan.

### Trial court's decision

After hearing all of the evidence, the trial court determined by clear and convincing evidence both that all three grounds were met with respect to Mother and Father and that it was in the best interest of the children for Parents' rights to be terminated.

### Issues on appeal

Both parents have appealed the trial court's decision. Mother asserts that the trial court erred in finding clear and convincing evidence that termination was in the best interest of the children. Moreover, pursuant to the holding of our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), we "must review the trial court's findings as to each ground for termination . . . , regardless of whether the parent challenges these findings on appeal."

Father argues that the trial court erred in (1) finding clear and convincing evidence of abandonment; (2) finding clear and convincing evidence of substantial non-compliance with the permanency plan; (3) finding clear and convincing evidence of failure to manifest an ability to parent; and (4) failing to adequately consider the statutory factors required to determine the best interest of the children.[4]

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND
APPELLATE REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

---

[4] Father's statement of the issues includes a fifth issue: "The Department of Children's Services failed to meet the constitutional requirement of reasonable efforts." In the argument section of his brief, however, Father identifies four errors with each addressed in one of four sections; the reasonable efforts issue appears as part of his best interest argument. We, therefore, address DCS's reasonable efforts in the context of best interests.

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d at 523-24 (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521-22, n.13 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists,

*Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted).

As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a party's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

I. Abandonment by failure to visit—Mother and Father.

The Department alleged that Mother and Father abandoned their four children by failure to visit pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i). The latter section defines "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). Both parents acknowledged that they had not visited their children during the four months prior to the filing of the termination petition in August 2018. (In fact, they had not visited the children in the three and a half years that the children had been in DCS custody.)

The following subsection regarding willfulness, Tenn. Code Ann. § 36-1-102(1)(A)(I), which took effect in July 2018, is also relevant in this case:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure.

Father makes the following argument:

> [B]ecause he was unaware of the steps needed to lift the no contact order and because DCS did not facilitate contact between the therapist and the parents, as is the normal course of action, Father's failure to have contact with his children was not willful and the Trial Court erred in finding that the Department had met its burden of proving abandonment.

Under Tenn. Code Ann. § 36-1-102(1)(A)(I), willfulness is an affirmative defense; thus, the burden is upon Father to establish that his failure to visit was not willful.

Pursuant to the trial court's adjudicatory order, Mother and Father were permitted to have "supervised, therapeutic visitation at the discretion of the therapist." The permanency plan provided that Mother and Father were not to have contact with the children unless recommended by their therapists, but they were to engage in the therapeutic process with the children's therapists.

In its general findings of fact, the trial court made the following findings pertinent to Mother and Father's communications with their attorneys:

> This Court finds the Respondents were responsible for maintaining contact with their respective attorneys and the Court finds entirely unbelievable any excuse that they could not reach their respective attorneys. The Court further finds that DCS was instructed not to speak with either Respondent directly, creating a hardship for DCS that was overcome by contact with the attorneys for the Respondents. Despite insisting that DCS communicate with them through their respective attorneys, both Respondents admitted that they had very limited communication with their respective attorneys.

We accord considerable deference to a trial court's findings based upon the credibility of witnesses and will not overturn such findings absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *Franklin Square Towne Homeowners Ass'n Inc. v. Kyles*, No. W2016-02018-COA-R3-CV, 2017 WL 1952833, at *3 (Tenn. Ct. App. May 10, 2017). We find no clear and convincing evidence conflicting with the trial court's findings here.

The trial court made the following findings of fact pertinent to the willfulness of Mother's failure to visit:

> The Court finds that [Mother] was in no way incapacitated or prevented from visiting with the children during the four-month period. The Court finds that [Mother] knew of her duty to visit because she had been to Court several times and was aware of the court's orders. In addition, [Mother] testified that she spoke with her attorney regarding the steps that she needed to take to acquire visitation. This Court finds that [Mother] could have had at least therapeutic visitation if she had followed the steps to contact any of the children's therapists and become involved in the therapeutic process. However, the Court also finds that [Mother] took no such steps.

The record does not preponderate against the trial court's findings. Mother testified that Ms. Lawson reviewed the current permanency plan with her and that she called Ms. Lawson a few times but never asked her for the therapists' contact information. Moreover, Mother was present for the dependency and neglect hearing when the trial

court ordered that therapeutic visitation would be allowed at the discretion of the children's therapists.

The trial court made the following factual findings regarding the willfulness of Father's failure to visit:

> The Court finds that [Father] was in no way incapacitated or prevented from visiting with the children during the four-month period. The Court finds that [Father] knew of his duty to visit because he had been to Court several time[s] and was aware of the Court's orders. In addition, [Father] is charged with the knowledge of the requirements that he had to follow to acquire visitation because the knowledge was found to have been delivered to his attorney in the manner that [Father] requested, although [Father] did not then follow up with his attorney. This Court finds it completely unbelievable that [Father] was not capable of more communication with his attorney. This Court finds that [Father] could have had at least therapeutic visitation if he had followed the steps to contact any of the children's therapists and become involved in the therapeutic process. However, the Court also finds that [Father] took no such steps.

The facts in the record do not preponderate against the trial court's findings. Father was present for the dependency and neglect hearing when the trial court ordered that therapeutic visitation would be allowed at the discretion of the children's therapists. Moreover, the Department asserts that it provided Father's attorney with a copy of the permanency plan after the December 19, 2017 meeting. Even if, as Father argues, his attorney did not receive the permanency plan sent by DCS after the meeting, Father's attorney was present at the February 2018 ratification hearing and had a copy of the permanency plan at that point, two months prior to the beginning of the four-month time period at issue here. Thus, Father was on notice of the requirement that he participate in the children's therapeutic process as a step toward possible visitation.

The record shows Mother's and Father's lack of effort to contact their attorneys or otherwise attempt to obtain contact information for the therapists in order to visit their children. Clear and convincing evidence supports the trial court's decision that Mother and Father abandoned their children by failing to visit in the four months preceding the filing of the petition to terminate.

II. Substantial noncompliance—Mother and Father.

The Department's petition to terminate also alleges that Mother and Father failed to substantially comply with the permanency plan created by DCS on December 19, 2017, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2).

Tennessee Code Annotated section 36-1-113(g)(2) allows a court to terminate parental rights where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Conditions that make foster care placement necessary "may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. If the trial court fails to make a finding regarding the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *Id.* The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656. Whether a parent is substantially noncompliant with a permanency plan is a question of law. *In re Valentine*, 79 S.W.3d at 548.

The trial court's order does not include a finding concerning the reasonableness of the requirements in the permanency plan. Thus, the first issue[5] we must address is whether the requirements of the permanency plan "are reasonable and related to remedying the conditions that caused the child[ren] to be removed from the parent[s'] custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. The permanency plan required both Mother and Father to update their contact information with DCS twice a month, engage in the children's therapeutic process, provide safe transportation, obtain safe and stable housing (including therapeutic housing), have a safety plan in place to address sexually reactive behavior, pay child support, and maintain a legal source of income. In addition, Father was required to participate in medication management and therapy; and Mother was required to complete a parenting assessment and follow the recommendations, inquire about vocational rehabilitation services, and sign releases with providers.

Were these requirements reasonable and related to the conditions that necessitated removal of the children from the parental home? The children were removed from the custody of Mother and Father in May 2015 due to allegations of sexual abuse against Father and because the entire family was living in one motel room with only two beds. Once in DCS custody, several of the children exhibited sexually reactive behavior, and

---

[5] With respect to substantial noncompliance, Father once again argues that he was not aware of the requirements of the permanency plan. As discussed regarding abandonment, the trial court did not credit Father's testimony that he was unable to contact his attorney, thus he was on notice of the contents of the permanency plan from at least the time of the ratification hearing in February 2018.

all four children required extensive therapy. The requirements of the permanency plan—including requiring both parents to engage in the therapeutic process and to provide a suitable home with a safety plan—are reasonable and tailored to the needs of the children and the issues that brought them into DCS custody in the first place.

We must now examine whether each parent substantially complied with the requirements of the permanency plan. Mother signed releases to allow DCS to contact providers. She did not complete vocational rehabilitation or the parenting assessment. In determining that Mother was in substantial noncompliance, the trial court made the following pertinent findings of fact:

> The Court finds that there was no testimony that [Mother] had done anything on the permanency plan developed on December 17, 2017. [Mother] admitted that she believed that she had spoken with her attorney regarding the Permanency Plan and that she did not make any follow up requests for additional information from her. Even if she did not have a conversation with her attorney specifically regarding the actions steps outlined in the permanency plan, she is charged with knowledge because she insisted that DCS make all communications with her through her attorney and the permanency plan was delivered to the attorney. [Mother] testified that she was living in a motel room, which this Court specifically deems unsafe for the children. In addition, [Mother] has made no effort to learn about the children's mental and psychological needs.

The evidence does not preponderate against the trial court's findings, with the exception of the fact that Mother did sign releases for providers.[6] We also note that sixty dollars was taken from her monthly social security benefits check to support all four children.

As to Father, the trial court likewise determined that Father was substantially noncompliant with the permanency plan based upon the following findings:

---

[6] Mother testified as follows with respect to the parents' living situation at the time of the hearing:

> Q. If the kids were sent home to live with you today, where would you take them?
> A. Well, it being nighttime, I guess I'd have to go up there [to the motel] and then call around and see about getting into a place to live for a bigger place. You know, because they couldn't stay there long. And then as soon as my check came again I'd be paying, not there at Family Inn, but paying for another home.
> Q. Now, you've moved quite a bit during this case; haven't you?
> A. A little, not a lot.
> Q. Okay. And you just haven't found something you can settle down with?
> A. Well, I can get these big places and then nobody is in it. And it's all empty with all their stuff, so I just put it back in storage and decided to just sit up there for now until I figure out what's going to go on.

The Court finds that there was no testimony that [Father] had done anything on the permanency plan developed on December 17,[7] 2017. [Father] initially stated that he might have spoken to his attorney about the Permanency Plan and then stated he probably did not. Nonetheless, he is charged with knowledge of the action steps on the Permanency Plan because it was delivered to him through his attorney as he had instructed DCS to do. Although there is a question of when the attorney received the Permanency Plan, it was settled that he received it no later than the February court date, a little more than six months prior to the filing of the Petition to Terminate Parental Rights. [Father] testified that he was living in a motel room, which this Court specifically deems unsafe for the children. In addition, [Father] has made no effort to learn about the children's mental and psychological needs.

According to Father's testimony, he was not ordered to pay child support because of his disability. Therefore, we will not consider Father's failure to pay child support in assessing his compliance with the permanency plan. With respect to all of the other requirements of the permanency plan, the evidence does not preponderate against the trial court's findings of fact.

There is clear and convincing evidence to support the trial court's determination that Mother and Father were in substantial noncompliance with the permanency plan and met the statutory requirements for parental termination on that basis.

III. Failure to manifest ability to parent—Mother and Father.

The third and final ground for termination alleged by DCS against Mother and Father is failure to manifest the ability to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

Pursuant to this ground, a court may terminate parental rights in situations where:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires DCS to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, DCS must prove that Mother/Father "failed to manifest an ability and willingness to personally

---

[7] The permanency plan was actually developed on December 19, 2017.

assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). If a party proves only the "ability" criterion or the "willingness" criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights. *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018). Second, the Department must prove that placing the children in Mother's or Father's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

Have Mother and Father shown an ability and a willingness to assume legal and physical custody or financial responsibility of their children? Although they may have a desire to reunite with their children, their actions fail to exhibit an ability or a willingness to take legal and physical custody or financial responsibility of the children. The trial court found:

> Although [Mother and Father] have stated that they would like to have the children returned to them, their actions have gone far awry from their claims. This Court finds that the Respondents have collectively and separately done nothing to have the children returned to them. They have currently lost their housing and their personal transportation, although both did state that they have means of getting from place to place. In addition, neither Respondent has made any effort to become involved in the children's respective therapy sessions or to at least learn about the children's differing needs by contacting the therapists.

The evidence does not preponderate against the trial court's findings. Mother and Father failed to stay in regular contact with their attorneys after informing DCS that they wanted all contact to go through the attorneys. They have not obtained stable housing and have not made any meaningful attempt to obtain the right to visit their children in the more than three years that the children have been in DCS custody. Moreover, Father and Mother have not taken the steps necessary to stay informed about the children's welfare.

Furthermore, there is clear and convincing evidence to support the trial court's conclusion that "it would be unsafe for the children to return home" to Mother and Father. The trial court made the following pertinent findings:

> There are two considerations here at the top of the Court's mind. First, the living arrangement for the Respondents is less than ideal. The Respondents are once again residing in a hotel room where the children would not be able to live with them. Testimony revealed that the children have to have safety plans in which they are not allowed to maintain in the same room with other minors without constant supervision. In addition, the children's therapists testified to the psychological danger associated with changes in

- 24 -

their environments and routines. Further, the therapists stated that the children no longer ask about their biological parents and that the younger do not even remember them. The youngest child, Airies, only remembers his foster parents as his parents.

The evidence does not preponderate against these findings.

There is clear and convincing evidence to support the trial court's decision to terminate Mother's and Father's parental rights on the ground of failure to manifest an ability and willingness to assume custody of the children.

IV. Best interests.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's and Father's parental rights, we must next consider whether the trial court properly determined that termination of their parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the children's interests diverge from those of the parent and the court focuses on the children's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the children's best interest from the perspective of the children, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the children to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d at 682.

The trial court made findings regarding each of the statutory factors:

(1) The Court finds that there has been no change in the circumstances of either Respondent. The Respondents are now residing in a hotel room, just like they were three and a half years ago, when it was found that the children were unsafe in that environment.

(2) The Court finds that the parents have not attempted to do anything on their Permanency Plan and that, although DCS could not provide substantial reasonable efforts, DCS put forth more effort than the parents by ensuring that the Permanency Plan was delivered to Respondents' counsel by at least February 15, 2018.

(3) The Court finds, as earlier, that there has been no visitation.

(4) The Court finds that there is no relationship between the Respondents and the children. There was extensive testimony that the children did not even remember their parents.

(5) The Court finds that it would clearly be deleterious for any of the children to be moved unnecessarily. Testimony from both therapists revealed that the children all suffered from issues surrounding changes in their environments and routines.

(6) Although Tiffany's knowledge of male anatomy and functionality begs the question "from where did she learn about this," the Court finds that there is no concrete proof that the children have ever been sexually or otherwise physically abused.

(7) The Court finds that the Respondents' current residence, a hotel room, is not a safe space to which the children could ever be returned.

(8) The Court declines to make a ruling surrounding the Respondents' respective mental statuses and what effect those respective statuses might have on the children.

(9) The Court finds that the Respondents appeared to make payments towards the children's support as they were instructed, but finds that the amounts would be woefully inadequate to care for the children.

The evidence in the record does not preponderate against these findings.

Although not challenging the trial court's findings, Mother emphasizes that she pays sixty dollars in child support each month out of her social security check, and that the DCS caseworker testified that she and Father provided some gifts for the children while they were in custody. Mother testified that she loves her children and would provide food, housing, and care for them if they were returned to her custody. She asks this court to "permit her another chance to be a parent." We acknowledge Mother's sincere wishes. Nevertheless, these children have been in foster care for three and a half years and there appears little likelihood that they will be able to return to Mother's custody in the near future. Clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the best interest of the children.

Father takes the position that the trial court failed to give adequate weight to DCS's failure to make reasonable efforts in this case. This court has previously stated that DCS's "duty to make reasonable efforts is 'a two-way street.'" *In re R.L.F.*, 278 S.W.3d 305, 313 (Tenn. Ct. App. 2008) (quoting *Tenn. Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006)) (*reversed on other grounds, In re Kaliyah S.*, 455 S.W.3d at 555). A "parent's response to and cooperation with the Department's reunification efforts" is one of the factors to be considered when evaluating the reasonableness of DCS's efforts. *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010). Thus, Father had a duty to communicate with DCS and to facilitate the Department's efforts to assist him. *See In re R.L.F.*, 278 S.W.3d at 313. As stated above, the trial court found that "DCS could not provide substantial reasonable efforts," but that "DCS put forth more effort than the parents by ensuring that the Permanency Plan was

delivered to Respondents' counsel by at least February 15, 2018." Because Father precluded DCS from communicating directly with him and required DCS to work through his attorney,[8] and because Father failed to stay in contact with his attorney, DCS was not able to make reasonable efforts on his behalf.

We agree with the trial court that there is clear and convincing evidence that termination of Father's parental rights is in the best interest of the children.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, Carol L.G. and Jason B.C., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[8] Father also asserts that he "clearly revoked [his request that DCS communicate with him only through his attorney] when he made numerous attempts to contact DCS after that text." However, because all communication was to be through the attorney, any revocation would also have to be made through the attorney.